No. 15-11297

_____

**In the
UNITED STATES COURT OF APPEALS
for the Fifth Circuit**

_____

**In re: Mirant Corporation**

_____

**MC Asset Recovery, L.L.C.,**

*Appellant,*

**v.**

**Commerzbank A.G.; Barclays Bank, P.L.C.; BNP Paribas; Danske Bank; ING Bank; Royal Bank of Scotland; Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank NV; Credit Agricole Corporate and Investment Bank, formerly known as Credit Lyonnais, formerly known as Calyon; Intesa San Paolo, formerly known as Banca Intesa; Royal Bank of Scotland Group, P.L.C.; Australia and New Zealand Banking Group Limited; Stichting European Power Island; European Power Island Procurement B.V.,**

*Appellees.*

_____

**Appeal from the United States District Court
for the Northern District of Texas**
*Honorable Terry R. Means, United States District Judge*

_____

**APPELLANT'S BRIEF**

_____

**G. Michael Gruber
Brian N. Hail
Laura M. Fontaine
Gruber Elrod Johansen
  Hail Shank, LLP**
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6800
Facsimile: 214-855-6808

**Jeffrey S. Levinger
Levinger PC**
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6817
Facsimile: 214-855-6808

*Attorneys for Appellant
MC Asset Recovery, L.L.C.*

No. 15-11297; *In re: Mirant Corporation; MC Asset Recovery, L.L.C. v. Commerzbank A.G., et al.*

The undersigned counsel of record certifies that the following listed persons and entities are described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. Those representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant**

MC Asset Recovery, L.L.P.

**Counsel for Plaintiff-Appellant**

G. Michael Gruber                        Jeffrey S. Levinger
Brian N. Hail                               Levinger PC
Laura M. Fontaine                        1445 Ross Avenue, Suite 2500
Gruber Elrod Johansen                  Dallas, Texas 75202
  Hail Shank, LLP
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202

**Defendants-Appellees**

Commerzbank A.G.
Barclays Bank, P.L.C.
BNP Paribas
Danske Bank
ING Bank
Royal Bank of Scotland
Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank NV
Credit Agricole Corporate and Investment Bank, formerly known as Credit
        Lyonnais, formerly known as Calyon
Intesa San Paolo, formerly known as Banca Intesa
Royal Bank of Scotland Group, P.L.C.
Australia and New Zealand Banking Group Limited
Stichting European Power Island
European Power Island Procurement B.V.

**Counsel for Defendants-Appellees**

William L. Kirkman          Hugh M. McDonald
Shelly Messerli              Patrick Fitzmaurice
Kirkman Law Firm, PLLC    Troutman Sanders LLP
201 Main Street, Suite 1160   875 Third Avenue
Fort Worth, Texas           New York, New York 10022


*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**
*Attorney of Record for Appellant*
*MC Asset Recovery, L.L.C.*

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 5TH CIR. R. 28.2.3, appellant MC Asset Recovery, L.L.C. requests oral argument. This is a fraudulent transfer action in which MCAR seeks to avoid a guaranty and recover from the appellees approximately €136 million in payments they received from the guarantor. The case is before this Court for the second time. In the first appeal, after hearing oral argument, the Court vacated the district court's judgment dismissing MCAR's claims because the court had made an erroneous choice-of-law determination, and remanded the case for further proceedings. *MC Asset Recovery LLC v. Commerzbank AG* (*In re Mirant Corp.*), 675 F.3d 530 (5th Cir. 2012). On remand, after extensive discovery and summary-judgment briefing -- and just a few weeks before the scheduled jury trial -- the district court dismissed MCAR's claims again. This time, it held that the subject guaranty purportedly "replaced" a previous guaranty that had been "reinstated," and thus the subject guaranty was given for "fair consideration" as a result of having satisfied "antecedent debt." Because the series of financial transactions relevant to this determination are very complex, and the pertinent legal principles are somewhat abstract, MCAR believes that oral argument will significantly aid the Court's decisional process.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ...................................................... iii

Table of Authorities ................................................................................. vi

Abbreviations and Record References...................................................... ix

Jurisdictional Statement ............................................................................ 1

Statement of Issues Presented for Review ................................................ 1

Statement of the Case................................................................................ 3

I.      Factual History.............................................................................. 3

II.     Procedural History. ..................................................................... 13

Summary of the Argument....................................................................... 17

Argument.................................................................................................. 20

I.      Standard of Review...................................................................... 20

II.     The District Court Erred in Granting Summary Judgment on the Element of Fair Equivalency Because Its Conclusion that the Subject Guaranty Merely "Replaced" a "Reinstated" Guaranty "Euro for Euro" Is Legally and Factually Erroneous. ................................................................. 21

        A.      The Court Failed to Make the Requisite Fact-Intensive Inquiry Into Fair Consideration, Which Measures and Compares the Value Given to the Value Received by the Debtor....................................... 23

        B.      Even Assuming the GE Guaranty Was "Reinstated" and "Replaced" by the Subject Guaranty, the Court Erred in Concluding that the Subject Guaranty Provided Fair Consideration by Satisfying Antecedent Debt.......................................... 28

                1.      Under the court's view of the evidence, the GE Guaranty could not be "antecedent debt" because it was reinstated

only as a result of -- and contemporaneously with -- the Commerzbank financing..........................................29

2. Even if the GE Guaranty were antecedent, the only amount of debt actually "satisfied" by the Commerzbank transaction was €23,479,231.25. ..............................31

3. The value of what Mirant received by the satisfaction of antecedent debt is far less than the value of what Mirant gave up in issuing the Subject Guaranty...................34

C. The Court Misinterpreted the Evidence and the Transactional Agreements in Determining that the GE Guaranty Was "Reinstated" and "Replaced" by the Subject Guaranty. ....................37

1. EPIP was not an "Affiliate" of MADP so as to trigger reinstatement of the GE Guaranty. ...........................39

2. EPIP could not be an Affiliate of MAPD without destroying the off-balance-sheet character of the financing.......................44

3. There is also no evidence that the GE Guaranty was "replaced" by the Subject Guaranty, even assuming it was "reinstated."...............................................45

4. The notion that the GE Guaranty was simultaneously "reinstated" and "replaced," all as a result of the Commerzbank financing, makes no commercial sense...........47

III. The District Court Erred in Granting Summary Judgment on the Element of Good Faith Because It Misapplied the Law to an Erroneous View of the Evidence..................................................................................50

Conclusion .....................................................................................55

Certificate of Service ....................................................................56

Certificate Regarding Privacy Redactions and Virus Scanning ...........57

Certificate of Compliance with Rule 32(a)...........................................58

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................20

*Butler Aviation, Int'l v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993)..............................................24, 36

*Cole v. Macklowe*, 99 A.D.3d 595 (N.Y. App. Div. 2012) ..............................45, 47

*Duval v. No. Assur. Co. of America*, 722 F.3d 300 (5th Cir. 2013)............................................................................................21

*Geron v. Pallidin Overseas Fund, Ltd. (In re Appliedtheory Corp.)*, 323 B.R. 838 (Bankr. S.D.N.Y. 2005)....................................................32

*Gray v. Fill (In re Fill)*, 82 B.R. 200 (Bankr. S.D.N.Y. 1987)........................................................50, 51, 52, 55

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ......................................24

*HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995) .......................32, 33, 35

*In re Capmark Fin. Grp. Inc.,* 438 B.R. 471 (D. Del. 2010)....................................33

*Klein v. Tabatchnick*, 610 F.2d 1043 (2d Cir. 1979) ...............................................24

*Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574 (7th Cir. 1998)...............................................................25

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48 (N.Y. App. Div. 2015) ................................................................47, 49

*MC Asset Recovery LLC v. Commerzbank AG (In re Mirant Corp.)*, 675 F.3d 530 (5th Cir. 2012)...................................................iii, 21, 22

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991)................................................................24

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir. 1996) ...........................................24, 25

*MetroplexCore, L.L.C. v. Parsons Transp., Inc.*,
  743 F.3d 964 (5th Cir. 2014) ............................................................... 20

*Official Comm. of Unsecured Creditors of Enron Corp. v.*
  *Whalen (In re Enron Corp.*), 357 B.R. 32 (Bankr. S.D.N.Y. 2006) ............ 29, 30

*Progress Bulk Carriers v. Am. Steamship Owners Mut. Prot. and Indem.*
  *Assoc.*, 939 F. Supp.2d. 422 (S.D.N.Y. 2013) ...................................... 49

*Rubin v. Manufacturers Hanover Trust*, 661 F.2d 979
  (2d Cir. 1981) ................................................................. 32, 33, 34, 35

*Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp*
  *Int'l Corp.*), 403 F.3d 43 (2d Cir. 2005) ............................................. 51

*Silverman v. Paul's Landmark, Inc. (In re Nirvana*
  *Restaurant, Inc.*), 337 B.R. 495 (Bankr. S.D.N.Y. 2006) .......................... passim

*Silverman v. United Talamudical Academy Torah Vyirah, Inc.*
  *(In re Allou Distribs., Inc.*), 446 B.R. 32 (Bankr. E.D.N.Y. 2011) ................ 50

*Southmark Corp. v. Marley (In the Matter of Southmark Corp.*),
  62 F.3d 104 (5th Cir. 1995) ................................................................. 29

*Tolan v. Cotton*, 572 U.S. ____, 134 S. Ct. 1861 (2014) ................................. 20, 53

*Truck Ins. Agency, Inc. v. Cure (Matter of Durham*),
  110 F.3d 286 (5th Cir. 1997) .............................................................. 24, 35

*U.S. v. McCombs*, 30 F.3d 310 (2d Cir. 1994) ............................................. 50

**Rules**

5TH CIR. R. 28.2.1 ................................................................................ i

5TH CIR. R. 28.2.3 ................................................................................ iii

**Statutes**

11 U.S.C. § 544(b) .............................................................................. 21

11 U.S.C. § 547(b) .............................................................................. 29

11 U.S.C. § 550 ................................................................................... 22

28 U.S.C. § 157 ..................................................................................1

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1334(a) ...........................................................................1

N.Y. DEBT. & CRED. LAW § 270 ......................................................29

N.Y. DEBT. & CRED. LAW § 272(a) ................................... 21, 24, 50

N.Y. DEBT. & CRED. LAW § 273 ................................................ 21, 24

**Other Authorities**

Dictionary.com, http://www.dictionary.com/browse/direct?s=t ............................40

# ABBREVIATIONS AND RECORD REFERENCES

## Abbreviations

"Commerzbank" refers to Commerzbank AG.

"Lenders" refers collectively to Commerzbank AG, Barclays Bank, P.L.C., BNP Paribas, Danske Bank, ING Bank, Royal Bank of Scotland, Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank NV, Credit Agricole Corporate and Investment Bank, formerly known as Credit Lyonnais, formerly known as Calyon; Intesa San Paolo, formerly known as Banca Intesa, Royal Bank of Scotland Group, P.L.C., Australia and New Zealand Banking Group Limited.

"Mirant" refers to Mirant Corporation.

"MCAR" refers to MC Asset Recovery, LLC.

"WestLB" refers to Westdeutsche Landesbank Girozentrale.

## Record References

"RE" indicates that the part of the record cited also appears in the Record Excerpts.

(i)     The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334(a).

(ii)     This is an appeal from the district court's order granting defendants' motion for summary judgment and denying MCAR's motion for partial summary judgment, and from the district court's final judgment.  The order and final judgment were both entered on December 10, 2015.  (ROA.34258 [RE 4], 34287 [RE 3]) MCAR filed its notice of appeal on December 29, 2015.  (ROA.34294 [RE 2])  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

MCAR, a special litigation entity established in Mirant's plan of reorganization, sued Commerzbank and the other Lenders under the New York Debtor and Creditor Law, seeking to avoid a guaranty that Mirant had issued to the Lenders and to recover approximately €136 million in payments made to the Lenders under the guaranty.  After more than ten years of litigation (and one successful appeal to this Court by MCAR), the district court granted the Lenders' motion for summary judgment, denied MCAR's motion for partial summary judgment (which sought to establish the amount of "antecedent debt" that had been satisfied), and dismissed MCAR's claims with prejudice.  These rulings give rise to three central issues, all of which are reviewed de novo:

1.     Did the district court err in holding that the guaranty from Mirant that MCAR seeks to avoid merely "replaced" a previous guaranty from Mirant that had been "reinstated" in the same transaction, thus satisfying an equivalent amount of antecedent debt and providing "fair consideration" for the issuance of the subject guaranty?

2.     Did the district court err in failing to conclude that the only amount of antecedent debt satisfied by the Lenders' financing was €23,479,231.25, an amount that was far less than the value of what Mirant gave the Lenders in issuing its guaranty?

3.     Did the district court err in holding that the evidence did not raise a genuine issue of material fact on whether the transaction between Mirant and the Lenders was lacking in "good faith," which provides an alternative basis for avoiding an obligation or a transfer under New York law?

## STATEMENT OF THE CASE

## I.    Factual History.

### 1.    The GE Transaction

Mirant was a publicly-traded energy company with operations and assets in North America, Europe, and Asia.  (ROA. 27247)  From its inception in 2000, Mirant was singularly focused on aggressive growth, and touted its ability to increase its earnings per share by 20-25% annually.  (ROA.30110-11)  Meeting this aggressive growth target became the driving force of Mirant's strategic planning: it would first determine the inputs necessary to support a 25% per year earnings growth, and then would work backwards to identify projects that would create the impression that this target could be met.  (ROA.30111; *see also* ROA.28540, 28559)

One of Mirant's strategies for meeting its growth target centered on entering into contracts for the purchase of large and expensive power turbines.  (ROA.27247)  In the words of its former treasurer, "[t]he more turbines you could say on your earnings calls, the higher your stock went because people saw you as the . . . growth platform."  (ROA.30376)  As a result of this strategy, Mirant had built up an inventory of 62 turbines by July 2000, more than half of which were not assigned to any particular project site.  (ROA.31297)

Despite being saddled with this excess turbine inventory, Mirant also pursued a strategy to purchase "power islands" -- massive power generating structures with

multiple turbines and heat-generation devices, which Mirant hoped to install in as-yet unidentified project sites in Europe. (ROA.27248, 27250) Mirant formed a special purpose entity -- Mirant Asset Development and Procurement, B.V. ("MADP") -- to enter into a contract with General Electric to acquire up to nine of these power islands. (ROA.27250, 28907) The Master Purchase and Sale Agreement between GE and MADP (the "GE Agreement"), which was signed on December 20, 2000, had staggered payment and delivery schedules for each power island, with the first progress payment coming due on February 19, 2001. (ROA.28907, 28911-12, 29046) Importantly, the GE Agreement was terminable at any time by the payment of a termination fee, which would take into account and give credit for the amount of any progress payments that had previously been made to GE. (ROA. 28912, 29046)

As part of the same transaction, Mirant also agreed to guaranty MADP's obligations to GE (the "GE Guaranty"). (ROA.30380) The GE Guaranty was required because MADP had no business or ongoing operation other than the acquisition of the power islands; thus, MADP was thinly capitalized, was entirely reliant on Mirant entities for funding, and was insolvent at all times. (ROA.26507, 29754) The GE Guaranty was executed on January 19, 2001. (ROA.30380)

At the time the GE Agreement was signed, Mirant had not yet arranged any financing for either the construction of the power islands or the projects in which the

power islands were to be installed. (ROA.8462) Mirant desired to keep the costs of this financing off of its balance sheet. (ROA.12734, 27250, 31407, 31434) In order to achieve such "off-balance-sheet" financing, Mirant and its subsidiaries had to avoid making any payments directly to GE; if they did, they would be deemed the "owner" of the power islands, thereby tainting their ability to obtain off-balance-sheet financing for either the power islands or the projects in which the power islands were to be installed. (ROA.31434) Thus, Mirant sought a credit facility that would provide off-balance-sheet financing for the construction and acquisition of the power islands from GE. (ROA.8462, 12734)

### 2. The WestLB Transactions

Mirant found a partial solution to its financing needs in a transaction initiated through another of its subsidiaries, Mirant Americas, Inc. ("MAI"). On February 8, 2001, MAI entered into an off-balance-sheet financing transaction with WestLB, referred to as a "C98 Agreement," that provided Mirant and MAI a framework for making equipment purchases without having to recognize them on their balance sheet. (ROA.29196) Under the C98 Agreement, WestLB would acquire rights in certain as-yet unidentified equipment purchase agreements, and then would make the payments due under those agreements. (ROA.29209, 29211) When the construction of the equipment was completed, MAI would become obligated to purchase or lease the equipment from WestLB, or sell it to someone else.

(ROA.29221-22) Mirant guaranteed MAI's obligations to WestLB under the C98 Agreement. (ROA. 29278)

As the February 19, 2001 deadline for the first progress payment to GE approached, Mirant decided to use the C98 Agreement as a means to provide interim off-balance-sheet financing for that first payment until a longer-term credit facility could be arranged. (ROA.12734) On February 15, 2001, MADP, MAI, and WestLB entered into an Addendum to the C98 Agreement ("the C98 Addendum") that provided this interim solution. (ROA.29312) Under the C98 Addendum, and a related Owner Assignment and Assumption Agreement (the "Owner Assignment Agreement"), MADP's rights and obligations under the GE Agreement were assigned to WestLB; WestLB became the owner of the power islands responsible for paying GE; and MADP was released from its existing obligations to GE. (ROA.29327-28 [RE 5], 29336)

Importantly, Mirant was also released from its obligations under the GE Guaranty, which GE no longer needed now that WestLB was responsible for making the progress payments. (ROA.29328, 29336) But GE sought to protect itself in the event that Mirant ever chose to take the power islands transaction back onto its balance sheet during GE's construction of the power islands; thus, the paragraph containing the release of the GE Guaranty also included a "proviso" stating that the GE Guaranty would be "deemed reinstated" upon any assignment by WestLB of its

6

interest in the GE Agreement to either MADP or an "Affiliate" of MADP. (ROA.29328 [RE 5])[1] Further, Mirant gave WestLB a "Reaffirmation of Guaranty," which confirmed that the guaranty it previously provided to WestLB would cover this interim transaction. (ROA.31070)

Because the C98 Addendum was meant to provide only interim financing until a longer-term credit facility could be arranged, it was structured in two tranches -- Tranche A, requiring WestLB to advance up to €25 million; and Tranche B, permitting WestLB (in its sole discretion) to advance another €1.175 billion, but only if it received 100% cash collateral. (ROA.10221, 29314) This made Mirant's Reaffirmation of Guaranty to WestLB superfluous for any advances beyond the initial €25 million tranche, because those additional advances would be secured by cash. (*Id*.)

In March 2001, after WestLB made the first progress payment to GE, Mirant sought proposals from selected banks to provide a longer-term off-balance-sheet "synthetic bridge financing" for the construction and acquisition of the power islands. (ROA.12733-41) MADP was to serve as the ultimate obligor of this financing, with Mirant guaranteeing MADP's obligations. (ROA.12736) Within a

---

[1] The term "Affiliate" was defined in the C98 Agreement. (ROA.29200, 29202, 29207) That definition, and its relevance to this case, is discussed in detail in Part II(C)(1) below.

few weeks of the proposal request, Mirant chose Commerzbank to provide this billion-dollar credit facility. (ROA.29391)

### 3.    The Commerzbank Transaction

On May 18, 2001, MADP notified WestLB that it would instruct WestLB to assign the GE Agreement to a then-unidentified third-party; that party would effectively step into WestLB's shoes as the owner of the power islands and payor of the progress payments to GE. (ROA.29337-38) For that to happen, MAI (and ultimately Mirant as guarantor to WestLB) were obligated to pay WestLB a "Termination Amount" representing the progress payments that WestLB had previously made to GE, plus WestLB's fees and expenses. (ROA.29208) The Termination Amount was €23,479,231.25. (ROA.29340)

One week later, on May 25, 2001, MADP and Mirant entered into a two-part credit facility with Commerzbank, which Commerzbank later syndicated to the other Lenders. (ROA.27250) The first facility required the Lenders to advance up to €600 million in progress payments to GE, while the second facility permitted them to advance another €500 million, but only with 100% cash collateral. (ROA.27257, 27260) Mirant gave a new guaranty to the Lenders -- the Subject Guaranty that MCAR seeks to avoid in this lawsuit -- that contingently obligated Mirant to cover MADP's obligations as the anticipated purchaser of the completed power islands, thereby repaying the Lenders for any amounts they paid GE for the construction of

the power islands. (ROA.29350-52) The Subject Guaranty would not be called upon, however, if the power islands could be delivered to project sites and successfully deployed, thereby attracting the "take-out" project financing that would repay the Lenders and make the Subject Guaranty unnecessary. (ROA.26781, 26783, 26785)

One of the other documents the parties executed on May 25, 2001 was a Purchase Option Assignment and Assumption Agreement ("the Purchase Option"), by which WestLB assigned its rights and obligations under the GE Agreement to European Power Island Procurement B.V. ("EPIP"), a special-purpose entity created to own and pay for the construction and acquisition of the power islands. (ROA.29339-40 [RE 6])[2] Under the Purchase Option, Commerzbank funded and EPIP paid the Termination Amount of €23,479,231.25 to WestLB. (ROA.29340) WestLB thus was repaid in full, but the Purchase Option nonetheless provided that Mirant, MADP, and MAI would not be released from any of their obligations to

---

[2] EPIP was a Netherlands corporation owned by Stichting European Power Island, which in turn was managed by Rabobank Management B.V. (ROA.12511, 12539-41, 29345) Under a Participation Agreement executed on May 25, 2001, the Lenders agreed to advance money to EPIP as the owner of the power islands, and EPIP would make the progress payments to GE. (ROA.29391, 29398) EPIP also entered into a Procurement Agency Agreement with MADP, which made MADP the agent responsible for administering the acquisition and construction of the power islands. (ROA.29375 [RE 7]) Once they were constructed, MADP was obligated either to purchase EPIP's interest in the power islands, remarket the power islands, or enter into a lease of the power islands upon their delivery. (ROA.29375, 29436-41)

WestLB. (ROA.29343) Mirant confirmed this understanding in a "Guarantor Consent," reaffirming that its previous guaranty to WestLB in connection with the C98 Agreement and the C98 Addendum would "remain in full force and effect," even after the financing from Commerzbank and the other Lenders. (ROA.29349) In contrast, none of the transactional documents referenced the GE Guaranty, which had previously been released in the WestLB transaction.

As of May 25, 2001, the effective date of the Commerzbank financing transaction, Mirant and MADP could have terminated the GE Agreement by paying GE only approximately €7 million more than the €23,479,231.25 that WestLB had previously paid GE in progress payments. (ROA.26406, 26461, 26775) But instead of having the GE Agreement terminated, Mirant took on a new and additional obligation to the Lenders -- through the Subject Guaranty -- that would expose it to up to €600 million in new liability if the power islands project could not attract take-out project financing. (ROA.26781, 26783, 26785, 29350) In fact, Mirant's exposure was virtually certain because, as of May 25, 2001, there was no reasonable likelihood that any of the power islands could be successfully delivered, deployed, and commercially operated at any site in Europe. (ROA.26058-59 [providing record citations])

Mirant, as it turned out, had no experience developing the project sites where the power islands were to be installed in Europe. (*Id*.) Even as of December 2000,

when the GE Agreement was signed, the power islands project was far behind schedule because no sites had been developed and no final permits had been obtained. (ROA.26276, 27278)  In late April 2001, Mirant's advisors at Boston Consulting Group told Mirant that Norway and Italy, the only two countries under consideration for the power islands project, were not viable candidates for a variety of reasons. (ROA.26129, 26283-84, 27891, 27896-97, 28094)  Indeed, MADP had not obtained an agreement with any gas supplier for the power islands targeted for Norway, and the permitting process in Italy was so slow and bureaucratic that the power islands had no realistic chance of being deployed there. (ROA. 26111-12, 26233, 26284, 26303-04)

In addition, although the Lenders knew that their advances of progress payments to GE were to be repaid from take-out project financing, such financing depended on the power islands being successfully placed into commercial operation at specific sites in Europe. (ROA.26264, 26281, 29997, 30020, 30338-39)  But the Lenders made no effort to find out the basic information needed to determine whether the power islands had any chance of success. (ROA.26304-05, 32144-46, 35107-10)  They did not seek that information because, from the beginning, they intended to look solely to the Subject Guaranty -- and thus Mirant -- for repayment. (ROA.29994-95, 30351-52)  And they did so despite receiving an opinion letter dated May 25, 2001 from Mirant's law firm, which cautioned them that the Subject

Guaranty could be invalidated under bankruptcy or other laws protecting Mirant's other creditors.  (ROA.30134, 30137)

Beginning in early 2002, as GE was ramping up its construction of the power islands, Mirant began to recognize -- belatedly -- that the power islands had no reasonable chance of being deployed anywhere in Europe.  (ROA.31539-40, 31544-45)  Accordingly, in February 2002, Mirant and MADP cancelled the orders for power islands 7-9, the last three in the sequence of scheduling.  (ROA.30926)  In accordance with the loan documents, the Lenders received repayment of €6.9 million for the progress payments they had made on power islands 7-9.  (ROA.30914-15)  Had the orders for power islands 7-9 been cancelled on May 25, 2001, when it was obvious that the likelihood of their successful deployment was remote, the termination fee to GE would have been only approximately €1.5 million (before taking into account the credits for the payments already made to GE).  (ROA.26461, 29046)

By the effective dates of April 2002, December 2002, and February 2003, Mirant and MADP also cancelled the orders for the remaining six power islands, and the Lenders received payments of €7.4 million, €4.5 million, and €118.1 million, respectively, representing the progress payments they previously had made to GE for those power islands.  (ROA.30905-12, 30916-25)  Had the orders for those six power islands been cancelled on May 25, 2001, the termination fee to GE would

have been only approximately €28.5 million (before taking into account the credits for the payments already made to GE).  (ROA.26461, 29046)

## II.    Procedural History.

On July 14, 2003, five months after the final power island order was cancelled, Mirant and a number of its subsidiaries filed for bankruptcy protection under Chapter 11.  (ROA.2007)  As debtor-in-possession, Mirant sued Commerzbank and the other Lenders on July 13, 2005, seeking to avoid the Subject Guaranty and to recover the €136 million in payments made to the Lenders between February 2002 and February 2003.  (ROA.2007-08)   On December 9, 2005, the bankruptcy court confirmed Mirant's plan of reorganization, which authorized the creation of MCAR as the litigation entity to pursue the avoidance action on behalf of Mirant's estate. (ROA.2008)   After MCAR was substituted as plaintiff in this case, it filed an amended complaint seeking to avoid the Subject Guaranty and the associated payments under the New York Debtor and Creditor Law and the Federal Debt Collection Procedures Act, both of which it alleged were "applicable law" under 11 U.S.C. § 544(b)  (*See* ROA.3956-89)

The Lenders moved to dismiss the amended complaint, arguing (among other points) that MCAR lacked standing; that the FDCPA could not serve as applicable law; and that Mirant could assert its claims only under the law of Georgia (where Mirant was headquartered), which did not allow for the avoidance of obligations like

guaranties.  (ROA.2008-09)  Following extensive discovery relating to the choice-of-law issue, the Lenders moved for partial summary judgment on the ground that Georgia law applied.  (ROA.2008, 2013)  The district court agreed (thus overruling the bankruptcy court's previous determination that New York law applied), and rendered judgment dismissing MCAR's claims.  (ROA.2031-32, 2034  On appeal, this Court vacated the district court's order of dismissal, holding that choice-of-law principles required the application of New York law, and remanded the case for further proceedings.  *In re Mirant*, 675 F.3d at 536-38.[3]

After remand, the same district court denied the remainder of the grounds in the Lenders' motion to dismiss and withdrew the order of reference to the bankruptcy court.  (ROA.2085, 2189)  The parties then embarked on months of discovery from fact and expert witnesses, much of which focused on whether Mirant had received "fair consideration" as of May 25, 2001 in exchange for issuing the Subject Guaranty to the Lenders.  (*See, e.g.*, ROA.26081-26785, 29709-30379)  At the close of discovery, MCAR moved for partial summary judgment, seeking a judicial determination that the only amount of "antecedent debt" satisfied in the transaction was €23,479,231.25 (ROA.8069, 8096), thus leaving for trial the remaining elements

---

[3] The Court also held that the FDCPA could not serve as applicable law (thus rejecting MCAR's alternative argument) and that MCAR did have Article III standing to avoid the transfers (thus rejecting the Lenders' cross-appeal).  *Id*. at 533-36.

of MCAR's avoidance claims under the NYDCL. The Lenders filed their own motion for summary judgment accompanied by an appendix of nearly 10,000 pages (ROA.9904-19529), arguing (among other points) that the Subject Guaranty could not be avoided under the NYDCL because it merely "replaced" and "satisfied," on a "euro for euro" basis, Mirant's previous guaranties to GE and WestLB, and thus was supported by "fair consideration" (ROA.25921, 25954-56).

In response to the Lenders' motion, MCAR asserted that the Lenders' "guaranty replacement" theory was factually untrue and legally erroneous because (1) the GE Guaranty previously had been released as a result of the WestLB transaction; (2) the guaranty to WestLB expressly survived the Commerzbank financing and exposed Mirant to no more than the Termination Amount of €23,479,231.25; (3) the only amount of consideration Mirant received in exchange for issuing the Subject Guaranty was €23,479,231.25; and (4) that amount was far less than the value of what Mirant gave up in issuing the Subject Guaranty. (ROA.26043-47) Although the Lenders' reply brief did not dispute that the GE Guaranty previously had been released, they asserted that the GE Guaranty had been "reinstated" under the "proviso" to the release in the Owner Assignment Agreement when WestLB assigned its interest in the GE Agreement to EPIP, an entity the Lenders characterized as an "affiliate" of MADP. (ROA.32020-21)

Nearly six months after the summary-judgment briefing was complete, the

district court asked the Lenders to correct what appeared to be an inaccurate citation in their reply brief to the source of the definition of the word "affiliate" as used in the proviso to the Owner Assignment Agreement. (ROA.34724) The inquiry sparked several letter briefs from the parties addressing (1) the source of the "affiliate" definition; (2) whether EPIP in fact was an "affiliate" of MADP; and (3) whether that issue had any legal effect on MCAR's avoidance action. (ROA.32422-28) In the meantime, the parties begin filing pre-trial materials in anticipation of a jury trial that the court had tentatively scheduled for early January 2016. (ROA.32593, 32618, 33861, 34169)

On December 4, 2015, the court sent a notice to the parties informing them that the jury trial would begin on January 12, 2016. (ROA.34186) But just six days later, the court issued an order granting the Lenders' motion for summary judgment, denying MCAR's motion for partial summary judgment, and rendering a final judgment dismissing MCAR's claims with prejudice. (ROA.34258 [RE 4], 34287 [RE 3]) The court held that Mirant had received "fair equivalency" for issuing the Subject Guaranty because: (1) the GE Guaranty had been "reinstated" in the Commerzbank financing as a result of WestLB's assignment of the GE Agreement to EPIP (which the court determined was an "Affiliate" of MADP); (2) the Subject Guaranty "essentially replaced" the GE Guaranty; and (3) the "replacement" was on a "euro for euro" basis, thereby satisfying "antecedent debt." (ROA.34273-79) In

addition, the court rejected MCAR's contention that the transaction was lacking in "good faith." (ROA.34279-85) Because MCAR thus had failed to prove both a lack of fair equivalency and a lack of good faith, the court concluded that "fair consideration was given by [the Subject Guaranty] as a matter of law." (ROA.34278, 34286) MCAR timely appealed from the court's order and final judgment (ROA.34294 [RE 2]), and it now seeks review of the court's rulings relating to the issues of fair equivalency, good faith, and fair consideration.

## SUMMARY OF THE ARGUMENT

In granting the Lenders' motion for summary judgment on the NYDCL's element of "fair consideration" -- and in denying MCAR's related motion for partial summary judgment on the amount of "antecedent debt" that was "satisfied" -- the district court misapplied the controlling legal principles and misunderstood the purpose and effect of the relevant transactions. Specifically:

***Lack of fair equivalency***: Contrary to the court's conclusion, Mirant did not receive a "fair equivalency" in exchange for issuing the Subject Guaranty to the Lenders in the financing transaction at issue. Even if it were true, as the court determined, that Mirant's previous guaranty to GE was "reinstated" in the Commerzbank transaction and "replaced" by the Subject Guaranty, the court still reached an erroneous legal conclusion in holding that the "replacement" was on a "euro for euro" basis such that the Subject Guaranty satisfied Mirant's "antecedent

debt" in an equivalent amount. To begin with, even under the court's view of the evidence, the GE Guaranty could not be "antecedent debt" because it did not precede, but in fact was only contemporaneous with, the Subject Guaranty. Moreover, as MCAR's summary-judgment evidence conclusively showed, the only amount of "antecedent debt" that the Commerzbank transaction actually "satisfied" was €23,479,231.25, which represented Mirant's exposure on a previous guaranty issued to WestLB, the interim lender. And the value Mirant received from the satisfaction of antecedent debt is far less than the value of what Mirant gave up in issuing the Subject Guaranty, meaning that there was *not* a fair equivalency.

Apart from these legal errors, the district court also misinterpreted the evidence, including the relevant transactional agreements, in determining that the GE Guaranty was "reinstated" and "replaced" by the Subject Guaranty. According to the court, the "reinstatement" occurred when WestLB assigned the GE Agreement to EPIP, which the court determined was an "Affiliate" of MADP, a subsidiary of Mirant. But EPIP was *not* an "Affiliate" of MADP, and it *could not be* an Affiliate of MADP without destroying the off-balance-sheet structure that the parties intended the financing to have. Moreover, even assuming the GE Guaranty was reinstated by an assignment to an "Affiliate," there is no evidence that the GE Guaranty was actually "replaced" by the Subject Guaranty (as opposed to merely surviving and standing side-by-side). And ultimately, it simply makes no commercial sense that

the GE Guaranty would have been "reinstated" as a result of the Lenders' financing transaction, only to have been simultaneously "replaced" that same day as a result of the same transaction. Summary judgment cannot rest on such unsupported and counter-intuitive assumptions.

*Lack of good faith*:  Even when there is a fair equivalency of value, a transaction still is avoidable if good faith is lacking. Although the district court recognized this principle, it adopted an erroneously narrow standard for determining a lack of good faith, and then misapplied its own standard to an erroneous view of the summary-judgment evidence. Outside the context of preferential-transfer cases, courts hold that good faith may be lacking if the transaction involves a failure to deal honestly, fairly, and openly. The summary-judgment evidence here amply satisfies this standard. Despite being informed of the risk that the Subject Guaranty could be set aside by Mirant's creditors, the Lenders entered into the transaction based on the expectation that they would look solely to the Subject Guaranty for repayment. Indeed, they made no meaningful evaluation of whether the object of their financing -- the construction and acquisition of nine power islands -- had any prospect of being successfully deployed so as to attract the take-out project financing needed to repay the Lenders without the Subject Guaranty. Only by overlooking or discrediting this summary-judgment evidence could the court conclude that MCAR failed to raise a fact issue on the absence of good faith.

For any or all of these reasons, the summary judgment in favor of the Lenders should be reversed, partial judgment should be rendered in MCAR's favor as to the amount of antecedent debt that was satisfied, and the case should be remanded for further proceedings.

**ARGUMENT**

## I.   Standard of Review.

The Court "review[s] the district court's grant of summary judgment de novo, affirming only if the moving party has demonstrated that there is no genuine issue as to any material fact and that judgment as a matter of law is warranted." *MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 972 (5th Cir. 2014) (citations omitted).  In determining whether a case presents triable issues of fact, courts "may not make credibility determinations or weigh the evidence." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Instead, courts "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Id*.   As the U.S. Supreme Court recently reiterated, a reviewing court will err if it "credit[s] the evidence of the party seeking summary judgment and fail[s] properly to acknowledge key evidence offered by the party opposing that motion." *Tolan v. Cotton*, 572 U.S. _____, 134 S. Ct. 1861, 1867 (2014).  When parties file cross-motions for summary judgment, as they did in this case, the Court will "review each party's motion independently," applying the same standard to

each.  *Duval v. No. Assur. Co. of America*, 722 F.3d 300, 303 (5th Cir. 2013) (citation omitted).

## II.  The District Court Erred in Granting Summary Judgment on the Element of Fair Equivalency Because Its Conclusion that the Subject Guaranty Merely "Replaced" a "Reinstated" Guaranty "Euro for Euro" Is Legally and Factually Erroneous.

As this Court held in the first appeal of this case, New York law applies to the avoidance claims that MCAR has asserted against the Lenders.  *In re Mirant Corp.*, 675 F.3d at 538.  New York has adopted the Uniform Fraudulent Conveyance Act, which provides that an "obligation" such as a guaranty is "fraudulent as to creditors without regard to [the obligor's] actual intent," if it was "incurred by [the obligor] who is or will thereby be rendered insolvent" and "the obligation is incurred without a fair consideration."  N.Y. DEBT. & CRED. LAW § 273.  The statute further provides that "[f]air consideration is given for . . . [an] obligation, [w]hen in exchange for such . . . obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."  *Id*. at § 272(a).

This appeal turns on one fundamental issue under these statutory provisions -- whether Mirant did or did not receive "fair consideration" in exchange for issuing the Subject Guaranty on May 25, 2001 to Commerzbank and the other Lenders in the power island financing.  If Mirant did not -- as MCAR contends -- the Subject Guaranty will be voidable under 11 U.S.C. § 544(b), and the payments made

to the Lenders pursuant to the Subject Guaranty will be recoverable under 11 U.S.C. § 550. *See In re Mirant*, 675 F.3d at 534.

In holding that MCAR failed to prove that the Subject Guaranty was incurred by Mirant without "fair consideration," the district court first analyzed the element of "fair equivalen[cy]" -- and in particular, whether and to what extent "antecedent debt was satisfied" by the Subject Guaranty. (ROA.34273) As to that issue, the court made three determinations:

- the GE Guaranty, which had previously been released on February 15, 2001 in the WestLB interim financing, was "reinstated" on May 25, 2001 as a result of WestLB's assignment of the GE Agreement to EPIP (ROA.34274-78);

- the "reinstated" GE Guaranty was "essentially replaced" by the Subject Guaranty (ROA.34278); and

- the "replacement" of the GE Guaranty by the Subject Guaranty was on a "euro for euro" basis (ROA.34279).

And from these three determinations, the court concluded that the Commerzbank financing, and the Subject Guaranty of which it was a part, satisfied Mirant's "antecedent debt" under the GE Guaranty, meaning that "fair consideration was given for [the Subject Guaranty] as a matter of law." (ROA.34273, 34278-79)

For a multitude of reasons, each of the court's three determinations -- and thus its ultimate conclusion about antecedent debt and fair consideration -- is fundamentally wrong. As discussed below in Part II(C), the court's first two determinations are not supported by the summary-judgment evidence; indeed, they

are contrary to the transactional agreements and the parties' intentions, and they simply make no commercial sense. But even if those two determinations were factually supportable, the court's third determination and ultimate conclusion are wrong as a matter of law. Far from satisfying "antecedent debt" of equivalent "euro for euro" value, the Commerzbank financing did no more than: (1) satisfy a pre-existing obligation, contingently owed by Mirant to WestLB, in the amount of €23,479,231.25, and (2) replace it with a new and additional obligation (the Subject Guaranty) that would likely expose Mirant to up to €600 million in new liability. Thus, as discussed below in Part II(B), the summary judgment can and should be reversed based on the proper application of the law -- without even having to parse the transactional agreements to reach the correct conclusion that the GE Guaranty was neither "reinstated" nor "replaced."

### A. The Court Failed to Make the Requisite Fact-Intensive Inquiry Into Fair Consideration, Which Measures and Compares the Value Given to the Value Received by the Debtor.

Before addressing the specific errors in the district court's summary-judgment order, it is useful to review the basic principles of "fair consideration" and its sub-element of "fair equivalency." Like the more familiar concept of "reasonably equivalent value" employed by the Bankruptcy Code and the Uniform Fraudulent Transfer Act, the concept of "fair consideration" under the NYDCL requires the fact-finder to: (1) measure the value (if any) that the debtor *gave* in the transaction at

issue; (2) measure the value (if any) that the debtor *received* in the transaction; and (3) compare the value given to the value received to ascertain if they are (or are not) reasonably equivalent. *See, e.g.*, *Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant, Inc.)*, 337 B.R. 495 (Bankr. S.D.N.Y. 2006) (analyzing claim to avoid debtor's guaranty under NYDCL §§ 272(a) and 273).[4] Time and again, courts have emphasized that the fairness of consideration -- and the related concept of reasonably equivalent value -- present fact-intensive questions surrounding the debtor's decision to enter into the transaction at issue.[5]

---

[4] Courts analyzing fraudulent transfer claims under the Bankruptcy Code also follow this three-step approach of measuring the value given and the value received, then comparing the two to determine if they are reasonably equivalent. *See, e.g.*, *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3d Cir. 1996) ("direct economic benefit must be measured and then compared to the obligations that the bankrupt [debtor] incurred") (quoting *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991)); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638-39 (2d Cir. 1995) (fact-finder must "attempt to measure the economic benefit that the debtor indirectly received from the entire transaction, and then compare that benefit to the value of the property the debtor transferred"); *Butler Aviation, Int'l v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993) (economic benefit to debtor must be "approximately valued as of the time the investment was made").

[5] *See Tex. Truck Ins. Agency, Inc. v. Cure (Matter of Durham)*, 110 F.3d 286, 289 (5th Cir. 1997) )"[w]hether fair consideration [now 'reasonably equivalent value'] has been given for a transfer is 'largely a question of fact, as to which considerable latitude must be allowed to the trier of fact'") (brackets in original, citation omitted); *Matter of Fairchild Aircraft Corp.*, 6 F.3d at 1125 n.5 ("valuing consideration received is inherently fact-laden, turning, as it often does, on the case-specific circumstances surrounding the debtor's decision to enter the particular transaction"); *see also Klein v. Tabatchnick*, 610 F.2d 1043, 1047-48 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact.").

The three-step approach to determining fair consideration is relatively easy to apply in cases involving a debtor's exchange of cash for goods or services. But it is frequently more difficult to apply when the obligation sought to be avoided is a guaranty -- and it can rarely be resolved as a matter of law. Because a guaranty is a "contingent and open-ended" obligation, *Nirvana*, 337 B.R. at 503, the value the guarantor gives up on the date it issues the guaranty is a direct function of the probability that the primary obligor on the debt will be able to repay the indebtedness in the future so that the guarantor will not have to do so. *See id.* (value given by guarantor depends on likelihood that guarantor, rather than obligor, will have to repay the debt in the future). Similarly, because any value the guarantor receives ordinarily consists of an opportunity for a future economic benefit from the transaction being guaranteed, the fact-finder "must determine the likelihood that the [guarantor] will actually realize those benefits," *id.* at 504, and such indirect benefits will not be recognized at all unless they are "fairly concrete." *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 578 (7th Cir. 1998).[6] The determination of both the value the guarantor is likely to give up and the value the guarantor is likely to receive must be made as of the date the guaranty was issued,

---

[6] *See also In re R.M.L.*, 92 F.3d at 153-54 ("while the chance of receiving an economic value is sufficient to constitute 'value,' the size of the chance is directly correlated with the amount of 'value' conferred").

without the benefit of hindsight. *Nirvana*, 337 B.R. at 503. (holding that guarantor's likelihood of receiving any benefit was "highly speculative," "illusory," and "virtually nil.").[7]

Applying these principles to this case leads to only one legitimate conclusion -- that Mirant did *not* receive fair consideration for issuing the Subject Guaranty to the Lenders because the value of what it gave up was enormous, while the value of what it was likely to receive (apart from the satisfaction of €23,479,236.25 in antecedent debt) was speculative and illusory. It is undisputed that the parties who were primarily obligated to repay the Commerzbank credit facility -- EPIP, a special purpose entity owned by an entity the Lenders established, and MADP, an indirect wholly-owned subsidiary of Mirant -- were insolvent as of the date Mirant issued the Subject Guaranty (and at all times thereafter). (ROA.26508, 29754-55) Thus, the value of what Mirant *gave up* when it issued the Subject Guaranty on May 25, 2001 was a function of EPIP's and MADP's ability to

---

[7] The district court overlooked these specific holdings in *Nirvana*, and instead quoted the *Nirvana* court's more general observation that "[a] guaranty is an 'antecedent debt,' and the payment on account of a pre-existing guaranty is, therefore, supported by 'fair consideration.'" (ROA.34273-74, quoting *Nirvana*, 337 B.R. at 502) The district court's reliance on this single sentence foreshadowed its confusion about the applicable legal principles, because the *Nirvana* court was merely saying that payments made on a guaranty cannot be avoided unless the guaranty itself is first set aside as fraudulent under the NYDCL. Thus, the *Nirvana* court went on to say that "[c]onversely, if the Guaranty is avoided as a fraudulent obligation, it cannot serve as 'fair consideration' for the subsequent transfers." 337 B.R. at 502. This sentence in *Nirvana*, not the one quoted by the court below, describes MCAR's claims in this case.

repay the Lenders. And that, in turn, was a function of the likelihood, as of May 25, 2001, that the object of the Lenders' payments -- the power islands -- could be successfully delivered, installed, and deployed so as to attract the take-out project financing that would repay the Lenders without the Guaranty. (ROA.26781, 26783, 26785) Similarly, the value of what Mirant *received* as of May 25, 2001 for issuing the Subject Guaranty also turned on the likelihood that the power islands could be successfully delivered, installed, and deployed.

As MCAR's summary-judgment evidence overwhelmingly established, the likelihood as of May 25, 2001 that any of the power islands could be successfully deployed was extraordinarily low -- meaning that the value of what Mirant gave up in issuing the Subject Guaranty *far exceeded* the value of what it received as of May 25. (*See* ROA.26058-59 [providing record citations]) Although that evidence compelled the district court to deny the Lenders' motion for summary judgment on the fact-intensive issue of fair consideration, the court bypassed the necessary three-step approach altogether and held that "[w]hether the power islands would ultimately be successfully deployed *does not appear to be relevant to this determination*." (ROA.34279, emphasis added). Instead, the court arrived at its determination of fair consideration by concluding that the Subject Guaranty merely replaced "the preexisting (and reinstated) Equipment Guaranty" to GE. (*Id.*) This conclusion is

wrong as a matter of law and insupportable under both the transactional agreements and the evidence.

**B.** **Even Assuming the GE Guaranty Was "Reinstated" and "Replaced" by the Subject Guaranty, the Court Erred in Concluding that the Subject Guaranty Provided Fair Consideration by Satisfying Antecedent Debt.**

As discussed below in Part II(C), the court simply misinterpreted the pertinent transactional agreements and evidence when it determined that the GE Guaranty was "reinstated" in the Commerzbank financing and then was "replaced" by the Subject Guaranty. Neither of those events happened, or even could have happened. But even if it were true that the GE Guaranty was reinstated and replaced by the Subject Guaranty, the court reached an incorrect legal conclusion when it held that the replacement was on a "euro for euro" basis, such that the Subject Guaranty satisfied Mirant's "antecedent debt" in an equivalent amount. (ROA.34273, 34278-79) This conclusion turns on a misconception of the meaning of the term "antecedent debt," as well as a misimpression of the specific *amount* by which any such debt was actually "satisfied" in the Commerzbank transaction.

Although the court below cited to the NYDCL definition of "debt" and the dictionary definition of "antecedent" (ROA.34271-72), it apparently lost sight of both definitions in its subsequent analysis of the relevant transactions. To be "antecedent," a debt must "precede" and not be "contemporaneous with" the transfer or obligation sought to be avoided. *Official Comm. of Unsecured Creditors of Enron*

*Corp. v. Whalen (In re Enron Corp.*), 357 B.R. 32, 47-48 (Bankr. S.D.N.Y. 2006) (interpreting 11 U.S.C. § 547(b)). Moreover, an antecedent "debt" is a pre-existing "legal liability" for an obligation that the debtor has incurred, whether such liability is unmatured, contingent, or unliquidated. *See* N.Y. DEBT. & CRED. LAW § 270 (defining "debt" to include "any *legal liability*," whether "matured, or unmatured, liquidated or unliquidated, absolute, fixed, or contingent") (emphasis added); *see also Southmark Corp. v. Marley (In the Matter of Southmark Corp.)*, 62 F.3d 104, 106 (5th Cir. 1995) (debt is antecedent when debtor "incurs" it before a transfer, and debtor "incurs a debt when he becomes legally obligated to pay it."). Based on these definitions, the GE Guaranty *cannot* be "antecedent" because (under the court's own view of the evidence) it did not precede the Subject Guaranty. Moreover, the only "debt" that Mirant even conceivably had a "legal liability" to pay as of May 25, 2001 was in the amount of €23,479,231.25. And while that amount was "satisfied" by the Lenders' credit facility (as MCAR demonstrated in its motion for partial summary judgment), that amount is *far less* than the value of what Mirant *gave* the Lenders as of May 25, 2001 in issuing the Subject Guaranty.

> **1.    Under the court's view of the evidence, the GE Guaranty could not be "antecedent debt" because it was reinstated only as a result of -- and contemporaneously with -- the Commerzbank financing.**

The first of many flaws in the court's reasoning is that the GE Guaranty cannot have been antecedent debt as a matter of law under the court's own view of the

29

evidence. According to the court, Mirant was released from its obligation under the GE Guaranty on February 15, 2001 in accordance with the Owner Assignment Agreement, but the GE Guaranty was subsequently "reinstated" under the proviso to the Owner Assignment Agreement when WestLB assigned its interest in the GE Agreement to EPIP, a purported "Affiliate" of MADP. (ROA.34274-79) Even if any of this were true, it only proves that the GE Guaranty is *not* "antecedent" debt within the meaning of that term.

Under the court's view of the evidence, the GE Guaranty was "reinstated" *only* as a result of WestLB's assignment to EPIP, which was effectuated by the Purchase Option Agreement dated as of May 25, 2001. (ROA.34262-63, 34274) Before that date, the GE Guaranty had been released and therefore was *not* a pre-existing legal liability of Mirant. But the Subject Guaranty -- which the court viewed as "replacing" the GE Guaranty -- was also dated as of May 25, 2001. (ROA.11849, 34263) Thus, Mirant's obligation under the reinstated GE Guaranty does not meet the definition of an "antecedent" debt -- *i.e.*, a debt that "precede[s]" and is not "contemporaneous with" the transfer or obligation at issue. *In re Enron*, 357 B.R. at 48. To the contrary, the GE Guaranty did not precede, but was only contemporaneous with, the Subject Guaranty. Because the Subject Guaranty therefore cannot have been given in satisfaction of "antecedent" debt represented by the GE Guaranty, the court below erred in holding that "fair consideration" was

given for the Subject Guaranty.  (ROA.34273, 34278)  The summary judgment should be reversed based on this error alone.

> **2.     Even if the GE Guaranty were antecedent, the only amount of debt actually "satisfied" by the Commerzbank transaction was €23,479,231.25.**

Even if the GE Guaranty had been reinstated and was antecedent to the Commerzbank financing on May 25, 2001, the district court committed yet another legal error when it failed to properly determine the specific *amount* of the antecedent debt that actually would have been *satisfied* by the Commerzbank financing and the Subject Guaranty.  All the parties agreed that, as of May 25, 2001, the Commerzbank financing satisfied €23,479,231.25 in antecedent debt, which represented the termination fee owed to WestLB that Mirant was legally obligated to pay under its guaranty to WestLB.  (ROA.34273)  Because the termination fee owed to WestLB roughly approximated the progress payments that WestLB had previously made to GE, a "reinstated" GE Guaranty would not have exposed Mirant to anything more than the €23,479,231.25 it was already obligated to pay WestLB under its guaranty to WestLB.  Thus, the Commerzbank financing would have satisfied no more than that amount.  The district court's failure to acknowledge this result -- and thus its failure to grant MCAR's motion for partial summary judgment -- are based on another misconception about the meaning of "antecedent debt."

As previously noted, antecedent debt is a pre-existing "legal liability" for an obligation that the debtor has incurred, whether such liability is unmatured, contingent, or unliquidated. (*See* Part II(B) above) Importantly, antecedent debt must be based upon a legal liability to pay for events -- such as the provision of goods or services or the advancement of loan proceeds -- *that have already occurred* before the date of the transaction sought to be avoided. *See, e.g., Geron v. Pallidin Overseas Fund, Ltd. (In re Appliedtheory Corp.*), 323 B.R. 838, 841 (Bankr. S.D.N.Y. 2005) (noting that "antecedent debt . . . arose by reason of the Lenders having provided the borrower *with actual cash* in the amount of the debt") (emphasis added). The possibility of future liability based upon services that have not yet been performed, goods that have not yet been provided, or loan proceeds that have not yet been advanced does not give rise to "antecedent debt" as a matter of law. Thus, in *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1060-61 (2d Cir. 1995), the court held that only the legal services that a lawyer had performed *before* the transfers at issue, and *not* his promise to provide additional legal services in the *future*, constituted an "antecedent debt" under the NYDCL that could be satisfied by the transfers to the lawyer.[8]

---

[8] Similarly, in the specific context of a guaranty of future advances, the court held in *Rubin v. Manufacturers Hanover Trust*, 661 F.2d 979 (2d Cir. 1981), that "[e]ven after the guarantees were executed, *there could be no liability under them* until [the lender] had actually loaned money to [the borrower]." *Id*. at 990 (emphasis added). One of the cases

Based on these principles, the *only* amount of antecedent debt that the Commerzbank financing actually satisfied was the €23,479,231.25 that was due and owing to WestLB as of May 25, 2001. The possibility that Mirant might incur future liability to GE for progress payments that were not yet due, relating to power islands that were not yet constructed, is *not* an antecedent debt as a matter of law. *See HBE Leasing*, 61 F.3d at 1061-62. Indeed, the court's apparent assumption that Mirant had a future "risk" of continuing to incur more liability under the GE Guaranty, had Mirant not obtained the financing from Commerzbank (ROA.34279), is not even *factually* true.

Importantly, that assumption overlooks two indisputable facts: (1) the GE Agreement (and thus the GE Guaranty) were freely terminable upon the payment of a termination fee to GE (the amount of which would take into account any progress payments previously made); and (2) Mirant had a clearly-expressed desire to finance the construction and acquisition of the power islands on an off-balance-sheet basis. (ROA.28912, 29046) Thus, had Mirant not been able to obtain the off-balance-sheet financing from Commerzbank (or another lender), it inevitably would have had to

cited by the court below -- *In re Capmark Financial Group Inc.* -- is not inconsistent with *Rubin* because, in *Capmark*, the lender actually advanced the proceeds from a loan guaranteed in 2009, and the debtor used those proceeds to repay a loan guaranteed in 2006 in which the same lender had also advanced the proceeds. 438 B.R. 471, 515-19 (D. Del. 2010). Thus, the 2009 guaranty satisfied antecedent debt arising from the 2006 guaranty.

exercise its contractual right to terminate the GE Agreement, rather than make the progress payments itself and thereby destroy its future ability to finance the entire power-plant project on an off-balance sheet-basis. (ROA.12734, 27248, 28912, 29046, 31434) And had Mirant exercised its contractual termination right as of May 25, 2001, it would have owed GE a termination fee of only approximately €7 million more than the previously-paid sum of €23,479,231.25. (ROA.26406, 26461, 26775) Accordingly, if Mirant did receive any "value" from issuing the Subject Guaranty in the Commerzbank financing, the amount of that value would have been no more than approximately €30.5 million.

### 3. The value of what Mirant received by the satisfaction of antecedent debt is far less than the value of what Mirant gave up in issuing the Subject Guaranty.

Finally, having misanalyzed whether and to what extent Mirant received any value from the satisfaction of antecedent debt, the district court compounded its error by failing to undertake the critical third step in the analysis -- comparing the value Mirant *received* to the value it *gave* in order to ascertain whether those two values are reasonably equivalent. (*See* Part II(A) above) Instead, the court apparently assumed that the satisfaction of *any* antecedent is *necessarily* fair consideration for the transaction sought to be avoided. (ROA.34278-79) But that is not the law. As the Second Circuit observed in *Rubin*, the value a debtor receives from the satisfaction of antecedent debt may or may not be "substantially equivalent" to the

34

value of the property it gave or the obligation it incurred, depending on the facts and circumstances. 661 F.2d at 991; *see also HBE Leasing*, 61 F.3d at 1061 (satisfaction of antecedent debt in the amount of $75,010 for unpaid legal fees was not a "fair equivalent" for the transfers of a $227,000 bond and a $278,000 note, and therefore fair consideration was lacking "as a matter of law").

Here, Mirant's purportedly "reinstated" guaranty obligation to GE was not "replaced" on a "euro for euro" basis with an identical guaranty obligation to the Lenders, as the court erroneously assumed. Rather, as of May 25, 2001, the Commerzbank financing did no more than (1) satisfy a pre-existing obligation, contingently owed by Mirant to WestLB, in the amount of €23,479,231.25, and (2) replace that obligation with a *new* and *additional* obligation to the Lenders (the Subject Guaranty) that could expose Mirant to up to €600 million in new liability. Importantly, the probability and extent of that exposure as of May 25, 2001 turn on the very question the district court held was "not relevant" (ROA.34279) -- namely, the likelihood that the object of the financing that Mirant guaranteed (*i.e.*, the power islands) could be successfully deployed so as to attract the take-out project financing that would repay the Lenders and make the Subject Guaranty unnecessary. *See Nirvana*, 337 B.R. at 503-04. That question presents a multitude of fact issues that only a jury can properly resolve. *See Matter of Durham*, 110 F.3d at 289 ("[w]hether fair consideration . . . has been given for a transfer is largely a question of fact, as to

which considerable latitude must be allowed to the trier of fact") (internal citations omitted).

It is no answer to suggest -- as the Lenders did below and as the court apparently accepted -- that if the Subject Guaranty must be evaluated on a forward-looking basis, then the GE Guaranty also must be evaluated on the same basis, "euro for euro." (ROA.23894, 23904, 34279) This argument confuses two separate and distinct concepts -- (1) the value a guarantor *receives* from the satisfaction of antecedent debt, and (2) the value a guarantor *gives up* in issuing its guaranty. The value a guarantor receives from the satisfaction of antecedent debt must be determined as of the date of the challenged transaction. *See Matter of Fairchild Aircraft Corp.*, 6 F.3d at 1127. In contrast, while the value a guarantor gives up is also determined as of the date of the challenged transaction, that value necessarily requires an evaluation of what will happen in the *future*, given that a guaranty is "contingent and open-ended." *See Nirvana*, 337 B.R. at 503 (value given by guarantor depends on likelihood that guarantor, rather than obligor, will have to repay the debt in the future).

Thus, in this case, the value Mirant *received* as of May 25, 2001 from the satisfaction of antecedent debt turns on the amount of Mirant's then-existing legal liability that the Commerzbank financing satisfied -- namely, the €23,479,231.25 owed to WestLB. In contrast, the value Mirant *gave up* as of May 25, 2001 turns on

the likelihood and extent to which Mirant would be called upon in the future to make payments under the Subject Guaranty. *Nirvana*, 337 B.R. at 503. As the summary-judgment evidence overwhelmingly shows, that likelihood was virtually certain and the extent could be as much as €600 million if the entire amount of the first facility were drawn down. (*See* ROA.26058-59 [providing record citations])

For these reasons, the district court erred by granting the Lenders' motion for summary judgment and by denying MCAR's motion for partial summary judgment on the amount of antecedent debt satisfied by the Commerzbank financing. Accordingly, the judgment should be reversed, judgment should be rendered that the amount of antecedent debt satisfied by the Commerzbank financing is no more than €23,479,231.25, and the case should be remanded for further proceedings.

**C.    The Court Misinterpreted the Evidence and the Transactional Agreements in Determining that the GE Guaranty Was "Reinstated" and "Replaced" by the Subject Guaranty.**

Although this Court can and should reverse the district court's "fair consideration" conclusion based on its legal errors alone, the district court's misinterpretation of the transactional agreements provides yet another ground for reversal. The court correctly noted that the GE Guaranty was released on February 15, 2001 when MADP's rights and obligations in the GE Agreement were assigned to WestLB under the Owner Assignment Agreement. (ROA.34261, 34274) But based on the "proviso" to that release, the court determined that the GE Guaranty

was "reinstated" on May 25, 2001 when WestLB assigned its interest in the GE Agreement to EPIP -- an independent entity wholly owned by Stichting and indirectly managed by Rabobank -- that the district court counter-intuitively viewed as an "Affiliate" of MADP. (ROA.34278) And having found that the GE Guaranty was "reinstated" on May 25, 2001, the court determined -- even more counter-intuitively -- that it was "replaced" that same day by the Subject Guaranty (ROA.34278-79), despite the absence of any evidence suggesting such an event.

From start to finish, these determinations are simply wrong. Neither the evidence nor the language of the transactional agreements supports the court's opinion that EPIP was an "Affiliate" of MADP, especially when EPIP did no more than step into the shoes of WestLB (which no one would describe as an "Affiliate" of MADP). Indeed, EPIP *could not* have been an Affiliate of MADP without destroying the very purpose of the Commerzbank transaction -- to provide off-balance-sheet financing to Mirant and its subsidiaries. Moreover, even assuming the GE Guaranty was "reinstated," there is no evidence that it was "replaced" by the Subject Guaranty. The notion that the GE Guaranty would suddenly spring back to life on May 25, 2001 as a result of the Commerzbank transaction, only to instantaneously disappear as a result of the same transaction, makes no commercial sense whatsoever.

1. **EPIP was not an "Affiliate" of MADP so as to trigger reinstatement of the GE Guaranty.**

In the reply brief supporting their motion for summary judgment, the Lenders asserted that the GE Guaranty was "reinstated" in accordance with the "proviso" in the Owner Assignment Agreement because WestLB had assigned its interest in the GE Agreement to EPIP, which the Lenders contended was an "Affiliate" of MADP. (ROA.32020-21)  Although the Lenders provided a definition of "Affiliate" that came from an unexecuted exhibit attached to the GE Agreement (ROA.32020, 32245) -- and not from the C98 Agreement that provided all the definitions for the Owner Assignment Agreement (ROA.29327) -- the district court overlooked that error and conducted its own analysis of whether EPIP was an "Affiliate" of MADP within the meaning of the C98 Agreement's definitions.  (ROA.34274-78)  In holding that it was, the court correctly used the definitions of "Affiliates" and "Control" in the C98 Agreement (ROA.34274-75), but it misapplied those definitions to an erroneous view of the transactional agreements and the evidence (ROA.34275-78).  Contrary to the court's conclusion, EPIP was *not* an "Affiliate" of MADP because there is no evidence that it either "controlled" or was "controlled by" MADP within the meaning of those contractually-defined terms.

The C98 Agreement's definitions relating to the term "Affiliate" are detailed and precise.  These definitions state that:

- "Affiliates" means "when used with respect to a specified Person, another Person that directly . . . Controls or is Controlled by . . . the Person specified."

- "Control" and "Controlled by" mean "the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise."

- "Person" means "any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization, Governmental Authority or any other entity."

(ROA.29200, 29202, 29207)  Recognizing that the C98 Agreement does not define the crucial phrase "power to direct . . . the management policies," the district court provided dictionary definitions of the terms "management" and "policies." (ROA.34275)  But it did not define the equally important term "direct" -- which means "to give authoritative instructions to; command; order or ordain" -- and it did not discuss that term or how it allegedly applies to the facts of this case.  *See* "Direct,"  Dictionary.com,  http://www.dictionary.com/browse/direct?s=t  (last visited May 13, 2016).

Notably, the district court did not cite to any testimony from a representative of MADP, Mirant, or any of the Lenders relating to the issue of whether EPIP was (or was not) an Affiliate of MADP.  In fact, there is no such testimony in the summary-judgment record.  Nor did the court cite to any testimony from a representative of EPIP -- and there is no such testimony, despite the fact that EPIP was a defendant represented by the same counsel as the Lenders.  Instead, the court's

determination that EPIP was an Affiliate of MADP rested entirely on a single transactional document -- the Procurement Agency Agreement dated May 25, 2001 between EPIP and MADP. (ROA.34275-77) That Agreement defined EPIP as the "Owner," responsible for using funds advanced by the Lenders to finance the acquisition and construction of the nine power islands; and it defined MADP as the "Procurement Agent," responsible for administering the acquisition and construction of the power islands for the benefit of EPIP. (ROA.29375 [RE 7]) Although the Procurement Agency Agreement contains fourteen pages of detailed provisions, none of them comes even close to establishing that EPIP was an "Affiliate" of MADP within the meaning of the definitions in the C98 Agreement.

To begin with, nothing in the Procurement Agency Agreement supports the district court's determination that "MADP controlled EPIP's management policies." (ROA.34275, 34277) As the Procurement Agency Agreement states, MADP was to serve as the "exclusive agent" for EPIP "in connection with the acquisition and construction of the Power Islands." (ROA.29375) Ordinarily, an agent does not control its principal -- let alone "direct" the principal's "management policies" -- and nothing in the Procurement Agency Agreement suggests otherwise in this case. The Lenders' argument that "EPIP ceded to MADP virtually unfettered control over the construction and acquisition of the power islands, which was EPIP's only purpose" (ROA.34277) does not establish the requisite control by MADP over any

41

management policies of EPIP; rather, it merely shows that MADP had control over the *assets* owned by EPIP. Indeed, there is no evidence of what EPIP's "management policies" even were, much less who had the "power to direct" them. If anyone did, it was Stichting (which owned EPIP's stock), Rabobank (which managed Stichting), or the Lenders (which made the decision when and how much money to advance to EPIP). (ROA.12539-41) But it would not have been a procurement agent like MADP.

There is also no evidence to support the district court's determination that "EPIP controlled MADP's management policies" (ROA.34278) -- a point that even the Lenders themselves never asserted (ROA.32020-21, 32423, 32426). Although the court recited the "basic tenet" that a principal "retains control" over the conduct of its agent (ROA.34278), that truism applies to virtually any relationship between a principal and its agent, including (for example) an owner and its independent contractor. But it does *not* establish that the principal/owner also has the "power to direct the management policies" of the agent/independent contractor. That is especially true here, where there is no evidence of what MADP's "management policies" even were, much less whether EPIP had the "power to direct" them. While the district court further found it significant that the Procurement Agency Agreement "carved out certain boundaries" where MADP had to obtain EPIP's express written consent -- including when it needed to incur expenses beyond the budget or to

terminate orders for power islands (ROA.34277-78) -- that "reservation of rights" (as the court described it) does not evince the "power to direct the management policies" of MADP. To the contrary, in language the district court quoted but overlooked, the Procurement Agency Agreement expressly provides that MADP "shall have *sole management and control* over the construction means, methods, sequences and procedures with respect to the construction of the Power Islands." (ROA.34277, quoting ROA.29377, emphasis added) Far from *directing* any management policies of MADP, EPIP thus *ceded* the direction of those policies to MADP itself.[9]

In short, neither the Procurement Agency Agreement nor anything else conclusively establishes that EPIP was an "Affiliate" of MADP under the specific definitions of the C98 Agreement. At the very least, there are genuine issues of material fact as to whether EPIP was an "Affiliate." Either way, the summary judgment in favor of the Lenders must be reversed.

---

[9] The court further overlooked the fact that EPIP entered into an Assignment of Procurement Agency Agreement and Related Rights dated as of May 25, 2001, the effect of which was to assign its rights under the Procurement Agency Agreement to the Lenders. (ROA.11915, 11917) Thus, even assuming EPIP acquired any power to direct the management policies of MADP, it simultaneously assigned away its right to exercise any such power.

## 2. EPIP could not be an Affiliate of MAPD without destroying the off-balance-sheet character of the financing.

Not only did the court err in determining that EPIP was an Affiliate of MADP, it further erred in overlooking the evidence that EPIP *could not be* an Affiliate of MADP if the parties' intentions were to be fulfilled. The evidence is undisputed that Mirant wished to finance the power islands on an off-balance-sheet basis and to obtain future project financing on the same basis. (ROA.12734, 27250, 31407, 31434) In seeking proposals for the financing of the power islands, Mirant asked the banks to describe how they intended to structure the "Owner Vehicle" that would take ownership of the power islands and make payments as the assignee of the GE Agreement. (ROA.12738) Importantly, as one of the outside accountants involved in the financing testified, the GE Agreement could *not* be assigned to an "affiliate" of Mirant in order for the financing to receive off-balance-sheet treatment. (ROA.31434) If that occurred, the off-balance-sheet structure would "be tainted" because Mirant, as "part of the same consolidated group . . . would be looked at as the owner for purposes of the accounting treatment." (ROA. 31434; *see also* ROA.12698-12717, 12723)

EPIP, of course, was ultimately created as the "Owner Vehicle" for the Commerzbank financing. But by interpreting the Procurement Agency Agreement and the C98 Agreement's definitions to mean that EPIP was an "Affiliate" of MADP, the court below reached a result that is precisely the *opposite* of what the

parties intended when they structured the transaction to meet -- not violate -- the requirements for off-balance-sheet financing. Such a result "runs afoul of the well-settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012). Because the court's reading of the parties' agreements produces all three of these impermissible results, its determination that EPIP was an "Affiliate" of MADP is erroneous for this additional reason.

### 3. There is also no evidence that the GE Guaranty was "replaced" by the Subject Guaranty, even assuming it was "reinstated."

Even if the district court were correct that EPIP was an "Affiliate" of MADP causing the GE Guaranty to be "reinstated" under the proviso, its summary judgment still cannot stand. Under the court's reasoning, the reinstatement of the GE Guaranty is only the first step; the GE Guaranty also had to be "replaced" by the Subject Guaranty in order for any antecedent debt to have been satisfied. (ROA.34278-79) But there is no evidence that the "reinstated" GE Guaranty in fact was "replaced" by the Subject Guaranty.[10]

---

[10] The absence of any such evidence also provides further confirmation that the purported "reinstatement" never occurred in the first place.

Notably, the Lenders did not point the district court to any transactional agreements showing that the GE Guaranty in fact was "replaced" by the Subject Guaranty as of May 25, 2001 (or any other date).  Nor did any of the Lenders testify that the Subject Guaranty had any such effect.  And there was no evidence from any representative of GE, Mirant, or MADP -- or even opinion testimony from any expert -- concerning that issue.  Indeed, if the reinstated GE Guaranty in fact had been replaced, the transactional agreements surely would have included a release or some similar acknowledgement from GE -- similar to the release GE previously gave when WestLB assumed responsibility for making the progress payments under the GE Agreement.   (ROA.29328, 29336)   But there was no such release or acknowledgement in the Commerzbank financing, and the district court cited to none.

Because there is no evidence that the allegedly reinstated GE Guaranty in fact was "replaced" by the Subject Guaranty, the only other possible conclusion is that it survived and remained in effect, standing side-by-side with the Subject Guaranty. In that sense, it would have been no different from Mirant's guaranty to WestLB, which "survive[d] and continue[d] to be in full force and effect" following the Commerzbank financing. (ROA.29349) But if the GE Guaranty remained in effect, it was not "replaced" by the Subject Guaranty -- and thus the Commerzbank financing and the Subject Guaranty did not provide any of the value the district court

ascribed to them. For this additional reason, the summary judgment on the issue of fair consideration must be reversed.

      **4.**     **The notion that the GE Guaranty was simultaneously "reinstated" and "replaced," all as a result of the Commerzbank financing, makes no commercial sense.**

Up to this point, MCAR's analysis of the district court's errors has been in the proverbial "weeds," commensurate with the court's approach of looking at the contractual language and evidence myopically and with little context. But it is useful -- indeed, it is required under New York law -- to step back and look at the "big picture" to see if the court's interpretation and application of the contractual provisions actually make any sense from a commercial standpoint. *See, e.g.*, *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 54 (N.Y. App. Div. 2015) (citing *Cole*, 99 A.D.3d at 596). For at least two reasons, they do not pass muster under that fundamental principle. It simply makes no commercial sense that the GE Guaranty would have been "reinstated" on May 25, 2001 as a result of the Commerzbank financing, only to have been simultaneously "replaced" that same day as a result of the same financing.

To begin with, the court's analysis overlooks the entire purpose of the proviso to the release in the Owner Assignment Agreement -- namely, to protect GE in the event that Mirant ever chose to take the power islands transaction back onto its balance sheet during GE's construction of the power islands. Mirant and MADP

47

initially were responsible for making progress payments to GE for the construction and acquisition of the power islands. But before the first progress payment came due on February 19, 2001, WestLB provided temporary off-balance-sheet financing for the power islands transaction. At that point, GE no longer needed to have Mirant as a guarantor because WestLB had now become the owner of the power islands, responsible for making the progress payments to GE. Thus, GE released the GE Guaranty on February 15, 2001 in the Owner Assignment Agreement. (ROA.29328, 29336)

Significantly, *nothing* changed from GE's standpoint on May 25, 2001, when WestLB assigned its rights and obligations in the GE Agreement to EPIP in the Purchase Option Agreement. Just as MAI had served as the procurement agent for WestLB in the WestLB transaction, MADP was now serving as the procurement agent for EPIP in the Commerzbank transaction. Just as WestLB had served as the owner of the power islands responsible for making payments to GE, EPIP was now serving as the owner responsible for making payments to GE (using funds provided by the Lenders). And just as GE had no need for the GE Guaranty when the power islands transaction was taken "off-balance-sheet" in the WestLB financing, it still had no need for the GE Guaranty when the power islands transaction remained "off-balance-sheet" in the Commerzbank financing. That explains why the only document GE signed in the Commerzbank financing -- the Purchase Option

Agreement -- nowhere mentions the GE Guaranty, the proviso, or the concept of reinstatement. (ROA.29339-48 [RE 6]) The proviso simply did not come into play because GE continued to have no need for the previously-released GE Guaranty.[11]

Moreover, and just as importantly, it makes no sense that the GE Guaranty would suddenly spring back to life on May 25, 2001 as a result of the Purchase Option Agreement, only to simultaneously disappear that same day as a result of the Subject Guaranty. But that metaphysical happening is precisely what the court's opinion assumes took place. Under New York law, however, courts will not interpret and apply contractual language to produce a result that would have been commercially unreasonable, irrational, or meaningless to the contracting parties. *See Macy's*, 127 A.D.3d at 54; *see also Progress Bulk Carriers v. Am. Steamship Owners Mut. Prot. and Indem. Assoc.*, 939 F. Supp.2d. 422, 428-29 (S.D.N.Y. 2013) ("The presumption in commercial contracts is that the parties were trying to accomplish something rational. [Thus, c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.") (brackets in original,

---

[11] That, of course, changed in February 2002 when Mirant and MADP began the process of taking the GE transaction back onto their balance sheet for the purpose of cancelling the orders for the nine power islands. (ROA.30926) During that process, Mirant had to pay GE a termination payment and a progress payment, which MCAR later sought to avoid, along with the GE Guaranty, in a subsequently-settled fraudulent transfer suit against GE. (ROA.3956, 3975, 3981-86) Contrary to the Lenders' arguments in the court below (ROA.23898, 32427), neither Mirant's payments to GE in 2002 nor MCAR's suit against GE in 2005 is evidence that the GE Guaranty was in effect *as of May 25, 2001* -- because it was not.

citations omitted).  The Lenders provided the court with no evidence, or even explanation, of why the sophisticated parties to the Commerzbank financing, including GE, would have intended such a nonsensical and meaningless result, and the court below erred by assuming it must have happened.  For this additional reason, the summary judgment in favor of the Lenders must be reversed.

## III. The District Court Erred in Granting Summary Judgment on the Element of Good Faith Because It Misapplied the Law to an Erroneous View of the Evidence.

Under section 272(a) of the NYDCL, "fair consideration" requires *both* "fair equivalen[cy]" and "good faith."  N.Y. DEBT. & CRED. LAW § 272(a).  That means that fair consideration will *not* exist if there is *either* a lack of fair equivalency *or* a lack of good faith.  Thus, courts have made clear that "even when there is a fair exchange of value, [the] conveyance can be set aside if good faith is lacking."  *U.S. v. McCombs*, 30 F.3d 310, 326 n.1 (2d Cir. 1994) (citing *Gray v. Fill (In re Fill)*, 82 B.R. 200, 216 (Bankr. S.D.N.Y. 1987)); *Silverman v. United Talamudical Academy Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 62-63 (Bankr. E.D.N.Y. 2011) (noting that conveyance can be set aside "upon the basis of lack of good faith").  Although the court below correctly recognized that the absence of good faith is an *alternative way* of proving a lack of fair consideration (ROA.34279-80), it misapplied the controlling legal principles to an erroneous view of the evidence in

concluding that MCAR had failed to raise a genuine issue of material fact on the absence of good faith.

Initially, the court adopted an erroneously narrow standard for determining good faith or the lack thereof. Quoting extensively from *In re Sharp International Corporation*, the court noted that "a mere preference between creditors does not constitute bad faith," which instead requires the transferee to have "either actual or constructive knowledge of [a] fraudulent scheme." (ROA.34280-81, quoting *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54-55 (2d Cir. 2005) But in *Sharp*, the debtor had merely repaid a lender who had advanced the loan proceeds in good faith, long before the debtor had engaged in any fraudulent activity. 403 F.3d at 55. In contrast, this case involves a guaranty and a credit facility where the loan proceeds were to be advanced *not* to the debtor or one of its subsidiaries, but instead to an unrelated third party (GE). In cases of this nature, courts take a broader and more flexible view of the concept of "good faith."

Specifically, outside the context of preferential transfers, courts interpreting the NYDCL hold that "[g]ood faith is not merely the opposite of actual intent to defraud but rather, the term imports 'a failure to deal honestly, fairly and openly.'" *In re Fill*, 822 B.R. at 219 (citation omitted). Good faith "may be lacking where a transferee has knowledge of a transferor's unfavorable financial condition at the time

of the transfer." *Id.* Thus, courts look to whether "there is an absence of one or more of the following:

1.      an honest belief in the propriety of the activities in question;

2.      no intent to take unconscionable advantage of others; and

3.      no intent or knowledge of the fact that the activities in question will hinder, delay or defraud others."

*Id.* The court below did not even acknowledge these indicia of a lack of good faith, much less apply them.

Compounding this error, the court also failed to view the summary-judgment evidence and the permissible inferences in the light most favorable to MCAR, choosing instead to draw its own conclusions about what the evidence showed. To start with, the court disregarded the evidence showing that the Lenders' credit facility did no more than satisfy a preexisting obligation, contingently owed by Mirant to WestLB, in the amount of €23,479,231.25, and then replace that obligation with a new and additional obligation (the Subject Guaranty) that would expose Mirant to up to €600 million in new liability if the power islands were unable to attract take-out project financing. Although the Lenders were well aware of these facts (having had access to the relevant transactional documents), the court below missed the point entirely of how the Lenders' actions were inconsistent with their obligation to act in good faith. Specifically, as the summary-judgment evidence showed, the Lenders intended from the outset to look only to the Subject Guaranty

for repayment, despite being warned, also from the outset, that they could be held accountable by Mirant's creditors for doing just that.

On May 25, 2001, the day the transaction closed, Mirant's law firm provided an opinion letter to Commerzbank, stating (among other points) that the Subject Guaranty would be enforceable against Mirant, "except as may be limited by bankruptcy, insolvency, reorganization and other similar laws relating to or affecting creditors' rights generally and by general principles of equity. . . ." (ROA.30134, 30137)  Although the Lenders thus were warned of the risk that the Subject Guaranty could be avoided -- the very object of this lawsuit -- they entered into the credit facility with the intention and plan of looking solely to the Subject Guaranty for repayment.  (ROA.30351-52)[12]  Indeed, even though lenders in transactions of this nature ordinarily expect to be repaid from take-out project financing (and only secondarily from a guaranty), the prospect of such financing here depended on whether the power islands could be successfully placed into commercial operation

---

[12] The court below thought it "a stretch at best" for MCAR to characterize a "boilerplate exclusion" as a warning to the Lenders, and it questioned whether the evidence actually showed that the Lenders were looking solely to the Subject Guaranty for repayment.  (ROA.34283-85)  But as to both of these issues, the court usurped the role of the jury by impermissibly making credibility determinations, weighing the evidence, and failing to properly acknowledge key evidence submitted by MCAR, the non-moving party. *See Tolan*, 134 S.Ct. at 1867.  In fact, the Lenders eventually stipulated -- after the summary-judgment briefing was completed and in response to MCAR's motion for discovery sanctions -- that they had performed no due diligence concerning the feasibility of Mirant's power islands project.  (ROA.32144-46, 35107-10)

at specific sites in Europe. (ROA.26264, 26781, 26783, 26785, 29997, 30020, 30338-39) But as to that prospect, the Lenders had no clue and did not care.

The evidence shows that Commerzbank and the other Lenders performed none of the due diligence that ordinarily would be expected of lenders who were advancing up to €500 million to GE for the construction of nine power islands. ROA.29774-75, 29782, 29838, 29908, 29995) Despite receiving documents showing that MADP was far behind schedule to take delivery of the power islands under the tight timeframe of the GE Agreement (ROA.26428-30, 26433, 27526, 27262, 27278-79), the Lenders entered into the credit facility without attempting to obtain even basic information about the power islands project (ROA.26304-05, 30336, 30351-52, 32144-46). In fact, when the Lenders sought to obtain insurance against the possibility of a strike at GE's facilities, they could not answer the underwriters' basic question about where the power islands would be placed. (ROA.28237-38) Their lack of knowledge particularly surprised one underwriter, who observed: "It's a hell of a lot of money to layout on the off-chance that you'll find a home for them and they're not the sort of thing you order for stock." (ROA.28237) But one possible explanation for the Lenders' ignorance appeared in a handwritten question on the underwriter's memorandum -- "guaranteed buy [sic] Mirant?" (ROA.28237) That in fact *was* the explanation -- the Lenders were not

concerned whether any "home" could be found for the power islands because they were looking directly to the Subject Guaranty for repayment.

The Lenders' decision to do so -- in the face of the warning from Mirant's law firm about what could happen if they did -- gives rise to triable issues of fact on any of the indicia of a lack of good faith. *In re Fill*, 82 B.R. at 219. The district court erred in concluding otherwise, and its summary judgment should be reversed for this additional reason.

## CONCLUSION

The district court's opinion turns on the notion that the GE Guaranty was "reinstated" as of May 25, 2001, that it was "replaced" that same day by the Subject Guaranty, and that the replacement was on a "euro for euro" basis. All three of these assumptions are wrong. The GE Guaranty was not reinstated as of May 25, 2001; even if it had been reinstated, there is no evidence it was "replaced" by the Subject Guaranty; and even if the Subject Guaranty did "replace" the "reinstated" GE Guaranty, the only effect of the transaction was to eliminate Mirant's existing exposure to €23,479,231.25 and replace it with likely exposure of up to €600 million. Because the evidence shows the absence of either "fair equivalency" or "good faith," the summary judgment against MCAR should be reversed, partial summary judgment should be rendered that the only amount of antecedent debt satisfied is

€23,479,231.25, and the case should be remanded for further proceedings consistent with those rulings.

Respectfully submitted,

/s/ Jeffrey S. Levinger

**G. Michael Gruber**
**Brian N. Hail**
**Laura M. Fontaine**
**Gruber Elrod Johansen**
**  Hail Shank, LLP**
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6800
Facsimile: 214-855-6808

**Jeffrey S. Levinger**
**Levinger PC**
1445 Ross Avenue, Suite 2500
Dallas, TX 75202
Telephone: 214-855-6817
Facsimile: 214-855-6808

*Attorneys for Appellant*
*MC Asset Recovery, L.L.C.*

### CERTIFICATE OF SERVICE

The undersigned certifies that on May 13, 2016, the foregoing Appellant's Brief was electronically filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the Appellate CM-ECF System. Participants in this case who are registered CM-ECF users will be served electronically by the Appellate CM-ECF System. Other participants will be served by e-mail.

/s/ Jeffrey S. Levinger

**Jeffrey S. Levinger**

**CERTIFICATE REGARDING PRIVACY REDACTIONS AND VIRUS SCANNING**

The undersigned certifies that: (1) all required privacy redactions have been made in this brief, in compliance with 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, in compliance with 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.


*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

    ☒   this brief contains 13,542 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

    ☒   this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2013 in 14 pt. Times New Roman (and 13 pt. for footnotes).

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**
*Attorney of Record for Appellant*
*MC Asset Recovery, L.L.C.*

May 13, 2016